**TRANSLOAD & TRANSPORT, INC.**

v.

**SUPERIOR OIL COMPANY, et al.**

**Civ. A. No. 82–6006.**

United States District Court,
E.D. Louisiana.

Feb. 28, 1984.

Roch P. Poelman and Andrew C. Wilson, New Orleans, La., for plaintiff.

Roxanne Armstrong, Houston, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

1. Plaintiff, Transload & Transport, Inc., a Louisiana corporation, owned and operated M/V RUSSELL GRANIER, a tugboat, on September 19, 1981.

2. Defendant, Superior Oil Company, a Nevada corporation qualified to do business in Louisiana, owned and operated M/V SUPCO II, also a tugboat, on September 19, 1981.

3. On September 18, 1981, BARGE 11 was loaded at Intercoastal City, Louisiana. The cargo consisted of several mud tanks, several segments of hoses, mud sacks coated with viscois, and assorted other drilling equipment.

4. Early in the morning of September 19, 1981, BARGE 11 was secured stern-to-stern with a similar barge, McD–248, the bow of which was in turn secured to the stern of SUPCO II.

5. Shortly thereafter, SUPCO II departed with its tow and proceeded westbound on the Intercoastal Waterway.

6. At all pertinent times, the skies were clear, and the temperature was mild. No significant wind or current conditions existed. Thus, weather was not a factor in the occurrence hereafter described.

7. Captain Frank Hebert, at the conn of SUPCO II, posted no watch over the tow.

8. Shortly before reaching Mile 181 on the Intercoastal Waterway, at some time between 8:00 and 8:30 a.m., it came to Captain Hebert's attention that BARGE 11 had taken a heavy list. BARGE 11 spilled part of its cargo—including two mud tanks, a great number of mud sacks, and at least one hose segment—into the Waterway, then righted itself.

9. Hebert turned SUPCO II and nudged the tow against the north bank of the Waterway, to prevent further loss.

10. M/V RUSSELL GRANIER was proceeding eastbound on the Waterway, pushing one empty barge from Houston to Morgan City, Louisiana.

11. Captain Randy Kilgore, at the conn of RUSSELL GRANIER, first became aware of the incident previously described at or shortly before 9:30 a.m., when he heard a radio call from SUPCO II announcing the spill near Mile 181.

12. At this time, RUSSELL GRANIER was a short distance behind another eastbound tug, which had four barges in tow. RUSSELL GRANIER had been gaining on the other eastbound tug for more than an hour.

13. After hearing the radio call, Kilgore was able to see SUPCO II roughly two miles ahead due to the straightness of the channel.

14. RUSSELL GRANIER began to reduce speed, and came to a stop before

reaching the accident site. The other eastbound tug, still ahead, also came to a stop.

15. When the tugs arrived at the scene, SUPCO II was holding its tow in place near the north bank. A section of one mud tank protruded from the water near the middle of the channel, approximately two hundred feet wide. Also in the middle of the channel, roughly one hundred feet from the first, was a second mud tank, which could be identified due to the water breaking over it. Mud sacks floated on the surface, littering the entire vicinity. The eastbound tugs remained in place for approximately forty minutes, during which time radio conversations were ongoing among the three vessels. Hebert did not mention hoses or other cargo besides the mud tanks. No hose segments were visible in the water at this time.

16. By radio, the three captains agreed that the best way to pass would be along the south bank. The other tug began to move past the accident at a rate just sufficient to maintain steerage. RUSSELL GRANIER began to follow in its wake, about three hundred to four hundred yards behind. Both eastbound tugs passed the site without noticeable incident.

17. Immediately upon clearing the debris-ridden area, RUSSELL GRANIER made passing arrangements with the other tug. RUSSELL GRANIER moved to the middle of the channel, then came full ahead.

18. Within fifteen seconds of hitting full throttle, the port engine shuddered and went dead. Kilgore took the starboard engine out of gear and came to a stop.

19. Kilgore notified Hebert that RUSSELL GRANIER had struck something. Hebert responded that he would begin to tell other vessels that they passed the site at their own peril.

20. Kilgore proceeded on one engine to Morgan City.

21. In dry dock, RUSSELL GRANIER was found to have a segment, roughly ten feet long, of four-inch hose from BARGE 11's cargo, wrapped around the port propeller shaft.

22. The hose segment was disentangled, the shaft was straightened, and the clutch assembly, including the clutch housing, was replaced.

### Conclusions of Law

1. This court has jurisdiction over this maritime claim and venue is properly set in the Eastern District of Louisiana.

2. Where a vessel sinks, or, as in this case, lists and spills cargo, in calm water, a presumption arises that the vessel was unseaworthy. *Reisman v. New Hampshire Fire Insurance Co.,* 312 F.2d 17, 20 (5th Cir.1963).

3. Defendant negligently failed to keep its tow under observation, allowing its unseaworthy condition to develop into a dangerous threat to Waterway traffic.

4. Defendant failed at trial to rebut the presumption of unseaworthiness. Furthermore, defendant failed to demonstrate any fault on the part of plaintiff.

5. Defendant is liable for the cost of repairs necessitated by the entanglement of the hose in the propeller shaft.

Counsel for plaintiff will submit a judgment consistent with these findings.